IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 04-1118
════════════
 
City of San Antonio, 
Petitioner,
 
v.
 
Charles Pollock and Tracy 
Pollock,
Individually and as next 
Friends of
Sarah Jane Pollock, a Minor 
Child, Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Fourth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued October 18, 
2006
 
 
            
Justice Hecht delivered the 
opinion of the Court, in which Chief 
Justice Jefferson, Justice Wainwright, Justice Johnson and Justice Willett joined, and in all but 
Part II-C of which Justice Brister 
joined.
 
            
Justice Medina filed a 
dissenting opinion, in which Justice 
O’Neill joined.
 
            
Justice Green did not 
participate in the decision.
 
 
            
When the government maintains a public nuisance that it knows is 
substantially certain to cause a specific injury to private property, it may be 
required by article I, section 17 of the Texas Constitution[1] to provide adequate compensation for 
taking or damaging the property.[2] The claim in this case is that benzene 
from a closed municipal waste disposal site migrated through the soil to a 
nearby home, reducing its value and causing the owners’ minor daughter to 
contract leukemia. We hold that there is no evidence the city knew its actions 
were substantially certain to cause the asserted injuries or that the personal 
injuries were caused by exposure to benzene. Accordingly, we reverse the 
judgment of the court of appeals[3] and render judgment for petitioner.
I
            
Charles and Tracy Pollock’s daughter Sarah was born in June 1994. In 
February 1998, she was diagnosed with acute lymphoblastic leukemia (“ALL”). Cancer is rare in children, 
but leukemia is the most common, and ALL is the most common type of childhood 
leukemia.[4] A bone marrow biopsy also found that 
sixty percent of Sarah’s bone marrow cells had 56 to 58 chromosomes instead of 
the expected 23 pairs; there were trisomies, a tetrasomy, and a translocation.[5] Following an intensive regimen of 
chemotherapy lasting more than two years, the cancer went into remission and the 
chromosomal anomalies disappeared. The statistical chance of recurrence is 
twenty percent.[6]
            
After Sarah began treatment, the Pollocks decided their family had 
outgrown the home in which they had been living in San Antonio since January 
1992, before Sarah and her younger sister were born, and they put it up for 
sale. The home backed up to an old limestone quarry the City had used as a waste 
disposal site from 1967 to 1972 called the West Avenue landfill. The landfill had been 
closed and covered over with several feet of dirt twenty years before the 
Pollocks bought their home, but they had always smelled what Tracy described as “a 
really strong, pungent odor” in the house, particularly in the bathrooms. They 
smelled the same odor in the back yard for several days after a rain.
            
The Pollocks’ realtor, wanting to fully disclose the condition of the 
property to prospective buyers, obtained an April 1998 report prepared for the 
City on methane gas concentrations around the landfill and gave it to the 
Pollocks. Anaerobic bacteria digesting landfill waste can produce large 
quantities of methane. Methane, the principal component of natural gas, is a 
colorless, odorless gas at room temperature and standard pressure.[7] It has a lower explosive limit of 5% and 
an upper explosive limit of 15%, which means that it is explosive at a 
concentration of between 5% and 15% in air. Though not toxic, it can cause 
asphyxiation at a concentration above 14% in air. Bacterial production of 
methane increases when leachate is present. Leachate is water that has seeped 
down into a landfill and percolated through it, collecting various contaminants 
along the way. Methane can serve as a carrier for other landfill byproducts and 
volatile organic compounds, such as benzene. Benzene is an aromatic hydrocarbon 
found in crude oil. At room temperature and standard pressure, benzene is a 
clear liquid with a sweet smell, but it evaporates quickly and is highly 
flammable. It is widely used as a gasoline additive, an industrial solvent, and 
a precursor in the production of other chemicals, and is present in cigarette 
smoke. Benzene is a known carcinogen.
            
Attached to the report the realtor obtained was an analysis of gas 
samples taken at the landfill, reflecting that small traces of benzene had been 
detected — 13.3 ppb in one sample and 146 ppb in another.[8] Tracy showed the report to one of Sarah’s 
oncologists, Dr. Kenneth Lazarus, who became alarmed and warned her to keep her 
children out of the back yard. The Pollocks immediately moved out of their home 
and sold it a few months later for $75,000. (They had paid $77,000 for it seven 
years earlier and were asking $94,000.) In January 2000, the Pollocks sued the 
City, claiming that Sarah’s ALL was caused by Tracy’s exposure to benzene from the 
West 
Avenue landfill during her pregnancy.
            
The evidence revealed that several years after the City closed the 
landfill in 1972, it began receiving complaints from nearby residents about 
odors caused by gases escaping from the landfill. In 1980, the City found that 
pockets of methane gas had formed near the landfill, some in potentially 
explosive concentrations. The highest observed concentrations were along the 
southwest side of the landfill, in the neighborhood where the home the Pollocks 
later bought was located. To collect methane from the landfill and prevent its 
migration into the surrounding area, the City drilled a system of ventilation 
wells around the perimeter, connected by a pipe, with a compressor to lower the 
pressure so that gas would be drawn from the landfill into the wells. The City 
also purchased two residences near the landfill in which gas had been detected, 
one just two blocks from the Pollocks’ property, to use as monitoring 
facilities.
            
In 1982, a survey of the water quality in several wells in the Edwards 
Aquifer detected various volatile organic compounds, including benzene, which 
might have come from the landfill. A consulting firm hired by the City concluded 
that methane was migrating through subsurface cracks in the walls and base of 
the landfill. Once outside the landfill, methane could also flow through the 
soil along trenches that had been dug to lay residential utilities, like water 
and sewer lines, and refilled. In that way, methane carrying benzene and other 
chemicals could migrate to the houses surrounding the landfill, endangering 
residents. The consultants also concluded that leachate had accumulated in the 
landfill, increasing methane production and blocking it from reaching the 
ventilation wells. The consultants recommended that the methane collection 
system be improved and wells drilled to remove leachate from the landfill.
            
The City made several improvements in 1985, but subsidence in the 
landfill continued to impair operation of the methane collection system and the 
leachate collection wells, causing portions of the system to collapse. 
Subsidence also allowed water to pool at the surface, increasing drainage 
through the landfill and the amount of leachate, which in turn increased methane 
production. When the Pollocks bought their home, there was a large hole in the 
back yard, apparently due to subsidence near the landfill. At the Pollocks’ 
request, the City filled the hole, but it developed again later, and the City 
filled it a second time.
            
In late 1989, a City engineer recommended major repairs to the methane 
collection system, and in August 1994, an outside contractor hired by the City 
recommended that the entire system be replaced. The City installed a new system 
in early 1998.
            
Over the years, the City regularly tested for landfill gas in the 
ventilation wells and at several homes near the landfill, including those used 
as monitoring facilities. The air near the Pollocks’ home was field-tested for 
methane at various times between 1981 and 1997, using a hand-held explosimeter. No methane was detected near the Pollocks’ 
home while they lived there. At trial, the Pollocks’ expert, Dan Kraft, an 
engineer with experience in landfill management, attempted to extrapolate the 
presence of landfill gas on the Pollocks’ property in 1993 and 1994, when Tracy 
was pregnant with Sarah, from samples taken in 1998 from a sealed monitoring 
well 128 feet deep, located 30 feet from the Pollocks’ back yard and 70 feet 
from their home. Those samples contained methane at a concentration of 477,000 
ppm (47.7%) and benzene at 146 ppb by volume. Assuming that the ratio of benzene 
to methane remained constant over time while methane from the landfill was 
decreasing — an assumption the City agreed was reasonable — and using an 
accepted EPA gas generation model, Kraft concluded that, had a sample from the 
sealed well been taken in 1993-1994, it would have contained at least 160 ppb 
benzene. Kraft then stated that in his opinion, gas with a composition similar 
to the sample entered the Pollocks’ home “on a regular basis”. Of course, 
landfill gas would immediately dissipate in the open air.[9] Even greatly diluted, the gas would have 
been asphyxiating and explosive. Kraft offered no opinion regarding any 
concentrations of methane or benzene in the ambient air in the Pollocks’ home 
and yard.
            
Dr. Mahendar Patel, Sarah’s other treating 
oncologist, testified that in his opinion, Sarah’s 
leukemia was caused by Tracy’s exposure to benzene while she was 
pregnant with Sarah. Patel was experienced in diagnosing and treating ALL but 
had done no research himself on the causes of the disease or any connection 
between ALL and benzene. He based his opinion at trial on Kraft’s testimony and 
on several studies of cancer rates in workers occupationally exposed to benzene. 
None of the studies considered an exposure to benzene at a concentration less 
than 31 ppm, which is 31,000 ppb, over 200 times the concentration in the 1998 
sample on which Kraft relied. The studies also found chromosomal anomalies in 
subjects, some of which were similar to Sarah’s, but the studies did not 
conclude that exposure to benzene was the most likely cause of anomalies like 
Sarah’s.
            
Garbage removal and disposal is a governmental function[10] for which the City is immune from 
liability, but the Pollocks contend that governmental immunity does not bar 
their recovery for nuisance and negligence. Article I, section 17 of the Texas 
Constitution requires compensation for a nuisance that amounts to a taking of 
property,[11] and the Texas Tort Claims Act waives 
immunity for governmental negligence in some circumstances.[12] The jury found that:
 
•           
the landfill was a nuisance;
 
•           
the City was negligent;
 
•           
the City acted with malice;
 
•           
actual damages caused by the nuisance and the 
negligence were:
 
•                       
$7 million for Sarah’s past and future physical pain and mental anguish, 
disfigurement, and physical impairment;
 
•                       
$111,000 for past medical care; and
 
•                       
$6 million for future medical care;
 
•           
property damages caused by the nuisance was 
$29,000; and
 
•           
$10 million exemplary damages should be assessed against the 
City.
 
The Pollocks 
elected to recover on their nuisance claim. The trial court reduced the award 
for future medical expenses to $500,000 and otherwise rendered judgment on the 
verdict, plus prejudgment interest and costs, for a total of $19,999,223.78. On 
appeal by the City, the court of appeals reversed the exemplary damage award and 
affirmed in all other respects.[13]
            
We granted the City’s petition for review.[14]
II
A
            
The Pollocks rest their claim that Sarah’s ALL was caused by in 
utero exposure to benzene from the West Avenue landfill on the opinions of 
their experts, Kraft and Patel. The City contends that the expert testimony was 
conclusory and therefore legally insufficient to support a judgment. The City 
raised this objection repeatedly in the trial court, in motions for directed 
verdict after the Pollocks rested their case and again at the close of the 
evidence, and by post-trial motions for judgment non obstante veredicto and for new 
trial. But the City did not object to the admission of the evidence.
            
Bare, baseless opinions will not support a judgment even if there is no 
objection to their admission in evidence. In Coastal Transportation Co. v. 
Crown Central Petroleum Corp., we summarized settled law as follows:
 
[A]lthough expert opinion testimony 
often provides valuable evidence in a case, “it is the basis of the witness’s 
opinion, and not the witness’s qualifications or his bare opinions alone, that 
can settle an issue as a matter of law; a claim will not stand or fall on the 
mere ipse dixit of a credentialed witness.” 
Burrow v. Arce, 997 S.W.2d 
229, 235 (Tex. 
1999). Opinion testimony that is conclusory or speculative is not 
relevant evidence, because it does not tend to make the existence of a material 
fact “more probable or less probable.” See Tex. R. Evid. 401. This Court has 
labeled such testimony as “incompetent evidence,” and has often held that such 
conclusory testimony cannot support a judgment. Cas. Underwriters v. Rhone, 134 Tex. 50, 
132 S.W.2d 97, 99 (1939) (holding that a witness’s statements were “but bare 
conclusions and therefore incompetent”); see also Wadewitz v. Montgomery, 951 S.W.2d 464, 466 
(Tex. 1997) (“[A]n expert witness’s conclusory statement . . . will neither 
establish good faith at the summary judgment stage nor raise a fact issue to 
defeat summary judgment.”). Furthermore, this Court has held that such 
conclusory statements cannot support a judgment even when no objection was made 
to the statements at trial. Dallas Ry. & 
Terminal Co. v. Gossett, 156 Tex. 252, 294 S.W.2d 377, 380 (1956) (“It is 
well settled that the naked and unsupported opinion or conclusion of a witness 
does not constitute evidence of probative force and will not support a jury 
finding even when admitted without objection.”); Rhone, 132 S.W.2d at 99 
(holding that “bare conclusions” did not “amount to any evidence at all,” and 
that “the fact that they were admitted without objection add[ed] nothing to 
their probative force”); see also Merrell Dow Pharms., Inc. v. Havner, 953 
S.W.2d 706, 712 (Tex. 1997) (“When the expert ‘brings to court little more than 
his credentials and a subjective opinion,’ this is not evidence that would 
support a judgment . . . . If for some reason such testimony were admitted in a 
trial without objection, would a reviewing court be obliged to accept it as some 
evidence? The answer is no.”).[15]
 
We held that a 
party may complain that conclusory opinions are legally insufficient evidence to 
support a judgment even if the party did not object to the admission of the 
testimony.[16]
            
When a scientific opinion is not conclusory but the basis offered for it 
is unreliable, a party who objects may complain that the evidence is legally 
insufficient to support the judgment.[17] An objection is required to give the 
proponent a fair opportunity to cure any deficit and thus prevent trial by 
ambush.[18] As we explained in Coastal, there 
is
 
a 
distinction between challenges to an expert’s scientific methodology and no 
evidence challenges where, on the face of the record, the evidence lacked 
probative value. When the expert’s underlying methodology is challenged, the 
court necessarily looks beyond what the expert said to evaluate the reliability 
of the expert’s opinion. When the testimony is challenged as conclusory or 
speculative and therefore non-probative on its face, however, there is no need 
to go beyond the face of the record to test its reliability. We therefore 
conclude that when a reliability challenge requires the court to evaluate the 
underlying methodology, technique, or foundational data used by the expert, an 
objection must be timely made so that the trial court has the opportunity to 
conduct this analysis. However, when the challenge is restricted to the face of 
the record — for example, when expert testimony is speculative or conclusory on 
its face — then a party may challenge the legal sufficiency of the evidence even 
in the absence of any objection to its admissibility.[19]
 
            
In Coastal, the plaintiff contended that the defendant was grossly 
negligent in using a defective device to prevent overfilling gasoline tanker 
trucks, resulting in a spill and fire.[20] An expert’s opinions that the defendant 
acted with conscious indifference were simple assertions with no basis at all, 
and we held that they were legally insufficient to support the judgment.[21] But even when some basis is offered for 
an opinion, if that basis does not, on its face, support the opinion, the 
opinion is still conclusory. Our decision in Volkswagen of America, Inc. v. 
Ramirez[22] is an example. There, the plaintiff’s 
car bumped against another vehicle traveling the same direction, then crossed a 
500-foot grassy median to the opposite side of the highway and hit a third car 
head-on.[23] The plaintiff’s expert concluded that 
the rear wheel of the plaintiff’s car came loose from the axle before the 
accident rather than after, and therefore caused, rather than was caused by, the 
accident.[24] The expert pointed to several facts to 
show that the wheel bearing failed and noted that after the accident, grass was 
found in the hub of the detached wheel.[25] But he could not explain how the wheel 
detached before the accident but nevertheless remained in the car’s wheel well 
while the car crossed the median and collided with another car.[26] We concluded that, even assuming the 
expert’s methodology was reliable (the defendant had not objected to it) and 
taking the record at face value, the facts on which he relied did not support 
his conclusion.[27]
            
When a scientific opinion is admitted in evidence without objection, it 
may be considered probative evidence even if the basis for the opinion is 
unreliable. But if no basis for the opinion is offered, or the basis offered 
provides no support, the opinion is merely a conclusory statement and cannot be 
considered probative evidence, regardless of whether there is no objection. “[A] 
claim will not stand or fall on the mere ipse dixit of a credentialed witness.”[28] In the case before us, the Pollocks 
argue that the City’s challenge to their experts’ testimony is really a 
challenge to its reliability — to the data used and the experts’ methodology. 
The City insists that it is not challenging the reliability of Kraft’s and 
Patel’s testimony, even conceding that it agrees with much of their methodology. 
Rather, the City contends that there is no basis in the record for the experts’ 
ultimate opinions, and therefore they cannot support the judgment. We examine 
each expert in turn and conclude that there was no evidence to support an award 
of personal injury damages on the Pollocks’ theories of nuisance or 
negligence.
B
            
Kraft’s testimony was offered to prove that Sarah Pollock was exposed 
in utero to landfill gas at levels high enough to cause ALL. Landfill gas 
had never been found on the Pollocks’ property from the time they lived there to 
the time of trial, but it had been found in other homes in the neighborhood, and 
it could have migrated to the Pollock’s property along underground utility lines 
or through the ground generally. The Pollocks smelled odors in their home and 
back yard which might have been landfill gas, and 
subsidence in their back yard might have been due to underground leachate from 
the landfill. In 1998, gas in a sealed monitoring well 128 feet deep and 30 feet 
from the Pollocks’ property tested 47.7% methane with 
146 ppb benzene by volume. Using an EPA-approved gas model, Kraft extrapolated 
that in 1993-1994, gas in the well would have been more than 50% methane with 
160 ppb benzene by volume. Based on this data and analysis, Kraft concluded: the 
Pollocks were exposed to gas levels like that in the sealed well. In other 
words, air on the Pollock’s property would have been like that found in the 
sealed well.
            
The City does not challenge any part of Kraft’s analysis except his final 
conclusion. The City does not quarrel with Kraft’s decision to use 1998 gas 
samples taken from the monitoring well closest to the Pollocks’ property, or 
with his assumptions that the benzene-to-methane ratio was constant over time 
while methane from the landfill was decreasing, or with his conclusion that 
therefore the benzene concentration in the well between 1993 and 1994 would have 
been 160 ppb. The City does not dispute that methane migrated out of the 
landfill or that it was possible for methane to migrate onto surrounding 
property, including the Pollocks’ property, through utility trenches or 
otherwise.
            
The City contends that none of these facts or analyses supportsKraft’s 
conclusion that the Pollocks were exposed to benzene at a level of 160 ppb in 
the air in their home and on their property. Assuming from Kraft’s data that in 
1993-1994, gas in the monitoring well would have been 50% methane and 160 ppb 
benzene, and that gas of that composition migrated onto the Pollocks’ property, 
it unquestionably dissipated in the ambient air. Unless the landfill gas was 
less than 28% of the ambient air — and the methane concentration reduced below 
14%, with a benzene concentration of 44.8 ppb — the Pollocks would have 
suffocated from the methane. Unless gas like that found in the well were 
less than 10% of the ambient air — and the methane concentration reduced below 
5% methane, with a benzene concentration of 16 ppb — there would almost 
certainly have been an explosion from the methane. There is no evidence 
whatever from which one could infer the concentration to which Tracy Pollock was 
exposed in the ambient air of her home and yard, but at the highest 
concentration possible, the methane — and consequently the level of benzene — 
could have been only a fraction of that in the sealed monitoring well. Kraft’s 
opinion that she was chronically exposed to benzene concentrations of 160 ppb 
has no basis in the record. Indeed, it is directly contradicted by his own data showing such concentrations present only in the 
well. Kraft’s opinion is the kind of naked conclusion that cannot support a 
judgment.
C
            
The purpose of Patel’s testimony was to prove that Tracy Pollock’s 
exposure to benzene concentrations of 160 ppb — assuming Kraft was correct — 
could cause Sarah’s ALL in utero. The City does not challenge the 
reliability of Patel’s data or methodology. The City concedes that Patel 
appropriately relied on epidemiological studies indicating that an unborn baby’s 
exposure through her mother to chemicals, including benzene, is capable of 
causing chromosomal anomalies and childhood leukemia.[29] The study most favorable to Patel’s view 
found that chromosomal aberrations like Sarah’s may result from exposure to 
concentrations of benzene less than 10 ppm[30] — more than 60 times the level of 
exposure that Kraft claimed. Another study on which Patel relied found a 
correlation between exposure to concentrations of benzene greater than 31 ppm 
and a particular chromosomal aberration, but noted that the effect was 
“clear[ly] dose dependent”.[31] The Pollocks’ maximum claimed level of 
exposure is only 1/200th of that exposure. No study was offered showing a 
relationship between chromosomal anomalies like Sarah’s and exposure to benzene 
at the lower levels the Pollocks claimed. This is perhaps hardly surprising, 
since the OSHA standard for maximum exposure to benzene in the work place is 1 
ppm[32] — more than six times the Pollocks’ 
exposure, according to Kraft. Given this large gap between the exposure levels 
in the studies that Dr. Patel relied on and the concentration Kraft hypothesized 
that the Pollocks had been exposed to, those studies provide no basis for his 
opinion that the Pollocks’ claimed benzene exposure caused Sarah’s ALL.
            
Patel asserted that the Pollocks’ exposure to benzene, as found by Kraft, 
was really higher than the exposure levels in the reports on which he relied 
because it occurred over a longer period. While it is possible that a long-term 
exposure to a low level of toxin might be worse than a short-term exposure to 
the toxin at much higher levels, it is just as likely, in the abstract, that the 
opposite is true.[33] Nothing in any of the materials on which 
Patel relied supported his assertion.
            
While some of Sarah’s chromosomal anomalies were also found with exposure 
to benzene, Patel testified others were unrelated to benzene exposure. There is 
therefore no basis for Patel’s testimony that Sarah’s pattern of chromosomal 
anomalies indicate her ALL was benzene-induced. Because neither the 
epidemiological studies nor the similarities in Sarah’s chromosomal anomalies 
support Patel’s opinion that Sarah’s ALL was caused by exposure to benzene in 
utero, his testimony was conclusory and cannot support liability.
            
A few months after this case was tried, the court of appeals in Exxon 
Corp. v. Makofski[34] reviewed all of the studies the parties 
could produce attempting to link ALL to benzene exposure and concluded that 
nothing showed a correlation to meet the standard of probative evidence set by 
this Court in Merrell Dow Pharmaceuticals, Inc. v. Havner.[35] The court concluded that the unsupported 
opinions of the experts in that case were no evidence.[36] For the same reasons, we reach the same 
conclusion here. Patel’s opinions were conclusory and provided no evidence that 
Sarah’s ALL was caused by Tracy’s exposure to benzene from the 
landfill.
III
            
The Pollocks claim property damages on the ground that the West Avenue landfill 
was a nuisance that amounted to a taking of property without adequate 
compensation in violation of article I, section 17 of the Texas 
Constitution.
            
We have held that the government’s “mere negligence which eventually 
contributes to the destruction of property is not a taking”;[37] rather, the government must act 
intentionally. This requirement is rooted in the constitutional provision that a 
compensable taking occurs “only if property is damaged or appropriated for or 
applied to public use.”[38] An accidental destruction of property 
does not benefit the public. The public-use limitation “is the factor which 
distinguishes a negligence action from one under the constitution for 
destruction.”[39]
            
For purposes of article I, section 17, a governmental entity acts 
intentionally if it knows either “that a specific act [was] causing identifiable 
harm” or “that the specific property damage [was] substantially certain to 
result from” the act.[40] A governmental entity is substantially 
certain that its actions will damage property only when the damage is 
“necessarily an incident to, or necessarily a consequential result of the 
[entity’s] action.”[41] The government’s knowledge must be 
determined as of the time it acted, not with benefit of hindsight.[42]
            
The Pollocks contend that the City knew its management of the West Avenue 
landfill[43] was damaging their property, or knew at 
least that damage to their property was a necessary result. But the evidence is 
all to the contrary. Whenever the City was aware that gas was migrating from the 
landfill, it took steps to prevent damage. It monitored gas generation, 
monitored leachate, and installed methane collection systems. We assume, as the 
Pollocks assert and the jury found, that those efforts were inadequate and that 
the City was negligent. But there is no evidence that the City knew that the 
Pollocks’ property was being damaged or that damage was a necessary 
consequence.
            
The Pollocks contend that the fact the City knew that subsidence, ponding, and gas generation and migration are inherent in 
the operation of a landfill is sufficient to show that the City knew its 
operation of the landfill was substantially certain to damage their property. We 
rejected essentially the same argument in City of Dallas v. Jennings, 
where homeowners attempted to show the city’s intent to damage their property by 
sewage flooding from the fact that the city knew that unclogging a sewer can 
sometimes cause it to back up.[44] The governmental entity’s awareness of 
the mere possibility of damage is no evidence of intent. The damage the Pollocks 
claim — the migration of gas onto their property — is neither necessarily 
incident to or a consequential result of the operation of a landfill. It can be 
prevented.[45] The City’s negligent failure to prevent 
landfill gas migration in this case is no evidence that it intended to damage 
the Pollocks’ property.
            
Since there was no evidence of a compensable taking, the City is immune 
from the Pollocks’ property damage claims.
* * *
            
We therefore reverse the court of appeals’ judgment and render judgment 
that the Pollocks take nothing on their claims.
 
                                                                        
_____________________
                                                                        
Nathan L. Hecht
                                                                        
Justice
 
Opinion 
delivered: May 1, 2009







[1] 
Tex. Const. art. I, § 17 (“No person’s 
property shall be taken, damaged or destroyed for or applied to public use 
without adequate compensation being made . . . .”).

[2] 
City of Dallas v. Jennings, 142 S.W.3d 310, 314, 316 (Tex. 2004) (“We . . 
. hold that when a governmental entity physically damages private property in 
order to confer a public benefit, that entity may be liable under Article I, 
Section 17 if it (1) knows that a specific act is causing identifiable harm; or 
(2) knows that the specific property damage is substantially certain to result 
from an authorized government action — that is, that the damage is necessarily 
an incident to, or necessarily a consequential result of the government’s 
action. . . . [A] city may be held liable for a nuisance that rises to the level 
of a constitutional taking.” (internal quotation marks 
omitted)).

[3] 
155 S.W.3d 322 (Tex. App.–San Antonio 2004).

[4] 
Acute lymphoblastic leukemia is also called acute 
lymphocystic leukemia. The American Cancer Society 
reported in its publication, Cancer 
Facts and Figures 2000, at 19 (2000), available at 
http://www.cancer. org/downloads/STT/F&F00.pdf (last visited Nov. 20, 2008): 
“Leukemia is the most common form of cancer in childhood, affecting 
approximately 2,600 children under age 15 in the United States 
each year. Leukemia accounts for about one-third of all cancers in children 
under age 15 and about one-fourth of all cancers occurring before age 20. Acute 
lymphoblastic leukemia (ALL) constitutes approximately 
three-fourths of all childhood leukemias. The peak 
occurrence of ALL is between ages 2 and 3, with rates slightly higher among 
whites and males. Five-year relative survival from ALL has greatly increased 
over time, and is now nearly 80%, primarily due to several improvements in 
treatment.”

[5] 
Normally, each of the 23 pairs of human chromosome consists of two copies of a 
linear strand of DNA material, one from the father and one from the mother, 
joined together at a point along their lengths called the centromere in a four-armed shape. A trisomy has three strands instead of a pair, and a tetrasomy has four. In 60% of Sarah’s bone marrow cells 
there were nine trisomies — at pairs 4, 6, 8, 9, 10, 
14, 17, 18, and 23 — and a tetrasomy — at pair 21. A 
translocation occurs when part of a chromosome is missing and attached instead 
to another chromosome. Sarah had a portion of chromosome pair 1 translocated to chromosome pair 22.

[6] 
Sarah also faces an increased risk of developing a secondary cancer as a result 
of her chemotherapy regimen.

[7] 
As a consumer safety measure, a foul-smelling odorant, usually methanethiol or ethanethiol, is added to 
natural gas sold for fuel.

[8] 
The Texas Commission on Environmental Quality gives these examples to illustrate 
“ppb” — parts per billion: 1 penny in 10 million dollars; 1 second in 32 years; 
1 foot of a trip to the moon; 1 blade of grass on a football field; 1 drop of 
water in an Olympic-size swimming pool. See 
http://www.tceq.state.tx.us/assets/public/remediation/superfund/jonesroad/ppb_chart.pdf 
(last visited Nov. 20, 2008).

[9] 
Methane is much lighter than air (0.55 specific gravity at 
standard temperature and pressure). Benzene vapor, though heavier than 
air, is volatile and dissipates rapidly in air. Agency for Toxic Substances & Disease 
Registry, U.S. Dept. of Health & Human Servs., Health Consultation: Review of On-Site Air 
Monitoring Data During the Removal at Le Mars Coal Gas Site 7 
(2005).

[10] Tex. Civ. Prac. & Rem. Code § 
101.0215(a)(6).

[11] Tex. Const. art. I, § 
17.

[12] Tex. Civ. Prac. & Rem. 
Code § 
101.021.

[13] 155 S.W.3d 322 (Tex. App.–San Antonio 
2004).

[14] 49 Tex. Sup. Ct. J. 567 (May 5, 2006).

[15] Coastal Transp. Co. v. Crown Central Petrol. Corp., 136 S.W.3d 227, 232 
(Tex. 2004) 
(footnote omitted).

[16] Id. (“We disagree that an objection is 
needed to preserve a no-evidence challenge to conclusory expert 
testimony.”).

[17] Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711-712 (Tex. 1997).

[18] Maritime Overseas Corp. v. Ellis, 
971 S.W.2d 402, 409 (Tex. 1998) (“To preserve a complaint that 
scientific evidence is unreliable and thus, no evidence, a party must object to 
the evidence before trial or when the evidence is offered. Without requiring a 
timely objection to the reliability of the scientific evidence, the offering 
party is not given an opportunity to cure any defect that may exist, and will be 
subject to trial and appeal by ambush.” (citations 
omitted)).

[19] Coastal, 136 S.W.3d at 233 
(citations omitted).

[20] Id. at 230.

[21] Id. at 231, 233.

[22] 159 S.W.3d 897 (Tex. 2004).

[23] Id. at 901-902.

[24] Id. at 902.

[25] Id. at 911.

[26] Id.

[27] Id.

[28] Burrow v. Arce, 997 S.W.2d 229, 235 (Tex. 1999).

[29] David A. Savitz 
& Kurtis W. Andrews, 
Review of Epidemiologic Evidence on Benzene and Lymphatic and Hematopoietic Cancers, 31 Am. J. Of Indus. Med. 287, 292-294 
(1997); Martyn T. Smith & Luoping Zhang, Biomarkers of Leukemia Risk: Benzene as a 
Model, 106 Envtl. Health Persp. 937, 943 (1998); Henriette Van Steensel-Moll et 
al., Childhood Leukemia and Parental Occupation: A Register-Based 
Case-Control Study, 121 Am. J. Of Epidemiology 216, 223 
(1985).

[30] Smith & Zhang, supra note 29, at 
941.

[31] Luoping Zhang et 
al., Interphase Cytogenetics of Workers Exposed to Benzene, 104 Envtl. Health Persp. 1325, 1328 
(1996).

[32] 29 C.F.R. § 1910.1028(c)(1) (2008).

[33] See, e.g., Lawrence G. Cetrulo, Toxic Torts Litigation Guide § 5.14 
(2008) (“Proof of exposure is not, by itself, sufficient to prove medical 
causation. A plaintiff must also prove that he was exposed to a sufficient 
amount, or dose, of a particular toxin to cause a particular disease. Virtually 
any agent, even tap water, may produce a toxic effect at a sufficiently high 
level of exposure. Conversely, it may be argued that even the deadliest poison 
is harmless at a sufficiently low level of exposure.”); Federal Judicial Center, Reference Manual on Scientific Evidence 
403 (2000) (stating that a central tenet of toxicology is that “‘the dose makes 
the poison’; this implies that all chemical agents are intrinsically 
hazardous—whether they cause harm is only a question of dose. Even water, if 
consumed in large quantities, can be toxic.” (footnote 
omitted)).

[34] 116 S.W.3d 176, 183 (Tex. App.–Houston 
[14th Dist.] 2003, pet. denied).

[35] 953 S.W.2d 706, 725-726 
(Tex. 
1997).

[36] Makofski, 116 S.W.3d at 187-188.

[37] City of Tyler v. Likes, 962 S.W.2d 489, 504-505 (Tex. 1997); see also City of Dallas v. Jennings, 142 
S.W.3d 310, 313 (Tex. 2004)..

[38] Tarrant Reg’l 
Water Dist. v. Gragg, 151 S.W.3d 546, 554-555 
(Tex. 2004) (internal quotation marks omitted) 
(quoting Steele v. City of Houston, 603 S.W.2d 786, 792 (Tex. 1980)(citing Davis v. 
City of Lubbock, 326 S.W.2d 699, 702-709 (Tex. 1959))).

[39] Gragg, 151 
S.W.3d at 555 (quoting Steele, 326 S.W.2d at 792).

[40] Jennings, 142 S.W.3d 
at 314.

[41] Id. (citations 
omitted).

[42] Id. at 315 (“[T]here is no 
evidence that the City knew, when it unclogged the sewer line, that any 
flooding damage would occur.” (emphasis 
added)).

[43] See City of Tyler 
v. Likes, 962 S.W.2d 489, 504-505 (Tex. 1997) (noting that a governmental entity 
may commit a taking through either the construction of a public work or the 
subsequent maintenance and operation of one).

[44] Jennings, 142 S.W.3d 
at 315.

[45] See Jeffrey Ball, Pollution 
Credits Lets Dumps Double Dip, Wall 
St. J., Oct. 20, 2008, at A1. The EPA has issued detailed regulations 
regarding the operation of a methane collection system. 40 
C.F.R. §§ 60.750-.759 (2008).